UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GUISEPPE SEDITA**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES OF AMERICA**, et al. <br><br> Defendants. | Case No. 1:24-cv-00900 (TNM) |

## <u>MEMORANDUM ORDER</u>

"Where was the Judge whom he had never seen?  Where was the High Court, to which he had never penetrated?"  Franz Kafka, *The Trial* 195 (Willa & Edwin Muir, trans., 1945).  Like Kafka's Joseph K., Plaintiff Giuseppe Sedita alleges he has been adjudged by a muddled and garbled governmental process that flouts his rights and offers no effectual remedy when he complains.  Three times, he has been given the run-around when trying to buy a firearm.  Each time, the Government has refused to greenlight his gun purchase.  And each time, Sedita has walked away empty-handed.  Although Sedita has repeatedly tried to set the record straight through the Government's administrative process, remedy has eluded him; the Government has rebuffed Sedita's attempts to clear himself through silence and nonresponsive form letters.  So he brought a statutory claim against the United States under 18 U.S.C. § 925A, arguing he was erroneously denied a firearm.  He also sued the Attorney General and the Director of the Federal Bureau of Investigation, arguing that the Government's retention of inaccurate information about him infringes his Second Amendment rights.

The Court finds that there is no triable issue over whether Sedita was denied a firearm by the Government.  Instead, the record is clear that Sedita was consistently *delayed* a firearm,

under the terms of the statute. So the United States is entitled to summary judgment on Sedita's statutory claim. That said, the federal officer Defendants cannot claim victory so easily. Sedita has shown that his proposed course of conduct—purchasing a firearm—falls within the plain text of the Second Amendment and is presumptively protected as a result. And Sedita has raised a question of fact as to whether the background check system was employed in an abusive manner towards him. The Court thus denies the federal officer Defendants' motion for summary judgment.

## I.

Plaintiff Giuseppe Sedita wanted to buy a gun. So three times, he headed to a local gun store in Suffolk County, New York. Compl. ¶¶ 40, 44. But Sedita was stalled at each attempt. Compl. ¶¶ 41, 44. This case aims to find out why—and whether that reason complies with the Second Amendment.

To do so, some explanation of federal firearms regulations is warranted. Under the Brady Handgun Violence Prevention Act, when someone comes to a licensed firearms dealer to buy a gun, the dealer must contact the National Instant Criminal Background Check System (NICS) to perform a background check on the customer. 18 U.S.C. § 922(t)(1); 28 C.F.R. § 25.1. NICS is housed within the FBI's Criminal Justice Information Services (CJIS) division. 28 C.F.R. § 25.3; Compl. ¶ 13. Once contacted, NICS searches relevant databases for any records suggesting that the customer may be prohibited from acquiring a firearm under federal or state law. 28 C.F.R. § 25.6(c); 18 U.S.C. § 922(d), (g), (n). The system will then spit out one of three responses: Proceed, Delay, or Deny. 28 C.F.R. § 25.6(c)(1)(iv)(A)–(C).

"Proceed" is straightforward enough: the licensed dealer can sell the firearm to the customer because no disqualifying information was found in the databases. 28 C.F.R.

§ 25.6(c)(1)(iv)(A); 28 C.F.R. § 25.2.  "Denied" is similarly self-explanatory.  It indicates that at least one disqualifying record has been found suggesting that selling the firearm would violate federal or state law.  28 C.F.R. § 25.6(c)(1)(iv)(C).  In such a case, the dealer is prohibited from transferring the gun.  28 C.F.R. § 25.2; 18 U.S.C. § 922(d).  Note, though, that a dealer never sees the underlying disqualifying record.  28 C.F.R. § 25.6(c)(2) ("None of the responses provided to the [dealer] . . . will contain any of the underlying information in the records checked by the system.").

The "Delay" response is opaquer.  It shows that the NICS search has turned up a record that "requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law."  28 C.F.R. § 25.6(c)(1)(iv)(B).  It also triggers a three-business-day waiting period—if NICS does not follow up with a denial by then, the dealer can legally complete the transaction, even if it has not received a formal "Proceed" response. *Id.*; 18 U.S.C. § 922(t)(1).  These transactions, however, remain open for further research by the FBI.  28 C.F.R. § 25.2.  And if later investigation reveals a disqualifying conviction, the FBI can repossess the firearm from the customer.  *Id.*  Of course, he may also face criminal charges.  *See* 18 U.S.C. § 922.

Whenever a NICS background check is performed, the system electronically generates a unique NICS transaction number.  28 C.F.R. § 25.2.  The transaction numbers and their creation dates are retained indefinitely.  18 U.S.C. § 922(t)(2)(C).  Transactions are also recorded in a more detailed NICS Audit Log, which contains additional information such as the type of transaction and identifying information about the prospective customer.  28 C.F.R. § 25.9.  But the Log is more ephemeral.  When transactions are denied, additional records are retained in the NICS Audit Log for ten years, after which they are transferred to an FBI-maintained electronic

database.  28 C.F.R. § 25.9(b)(1)(i).  For delayed transactions, additional records are destroyed

not more than 90 days from the date of inquiry.  28 C.F.R. § 25.9(b)(1)(ii).  And for approved

transactions, identifying information is deleted within 24 hours of purchase, and all other records

(save for the transaction number and date) are destroyed not more than 90 days later.  28 C.F.R.

§ 25.9(b)(1)(iii).

 If a customer believes he has been erroneously denied a firearm, he can file a written

"challenge" with CJIS.  28 C.F.R. § 25.10(c)–(d).  Challenges focus on specific denials of a

firearm.  More broadly, any person can apply to be entered into the NICS's Voluntary Appeal

File database.  This process allows applicants to request that NICS maintain information about

them in the system.  28 C.F.R. § 25.10(g).  The Voluntary Appeal File was established to prevent

future erroneous denials or extended delays of a firearm transfer.  *Id.*  An applicant who is

entered into the Voluntary Appeal File is given a Unique Personal Information Number that

allows him to access his records to expedite a future transaction.  *See* Compl. ¶ 48.

 Aside from the administrative routes, a person who has been wrongly "denied a firearm"

can "bring an action against the State or political subdivision responsible for providing the

erroneous information, or responsible for delaying the transfer, or against the United States, as

the case may be, for an order directing that the erroneous information be corrected or that the

transfer be approved[]."  18 U.S.C. § 925A.

 Now to Sedita.  He alleges that he tried to buy two firearms in 2021, but both purchases

were "erroneously denied by NICS."  Compl. ¶ 41.  Through his attorney, he contacted NICS to

obtain the grounds for denial of his firearm purchases.  Compl. ¶ 42.  NICS conveyed that the

transaction numbers were "too old" and that the agency no longer had any information about the

attempted purchases.  Compl. ¶ 43.  So Sedita was stalled on these first two firearm purchases.

With neither answers nor a gun, Sedita again tried to exercise his Second Amendment right and buy a different firearm. But he alleges that once more, "his transaction was wrongfully denied by NICS," and he could not obtain a gun. Compl. ¶ 44.

Again, he wrote NICS to inquire why. Compl. ¶ 45. CJIS informed Sedita that his purchase was not "denied" but merely "delayed." Compl. ¶ 46; *see also* First NICS Packet, ECF No. 11-3, at 10 (indicating the transaction number could not "be matched to a transaction maintained in the NICS" and that "the FBI is required to destroy all proceeded transactions" and "delayed transactions" and thus it was "possible that [Sedita's] transaction fits one of these two categories."). Sedita decided to complete a Voluntary Appeal File packet to hopefully obtain a Unique Personal Information Number and prevent future delays or denials by NICS. Compl. ¶ 48; First NICS Packet at 2.

But this, too, was in vain. The CJIS rejected Sedita's Voluntary Appeal File request after determining he was ineligible to be entered into the system. VAF Denial, ECF No. 11-4, at 2. It noted that Sedita had a state conviction that fell under a "potentially prohibitive category." *Id.* Specifically, CJIS thought Sedita was disqualified from owning a firearm under either 18 U.S.C. § 922(g)(8), which applies to those subject to a restraining order by an intimate partner or child, or 18 U.S.C. § 922(g)(9), which applies to someone who has been convicted of a domestic violence misdemeanor. VAF Denial at 2. A copy of the allegedly disqualifying criminal record was attached to the denial. VAF Denial at 4–9. The FBI informed Sedita that if he wished to challenge the accuracy of the record on which the Voluntary Appeal File rejection was based, he could apply directly to the state court from which the record originated. VAF Denial at 3.

But Sedita thought this denial was inappropriate. True, he had been convicted in state court of a misdemeanor charge of attempted assault and was formerly subject to a protective

order as a result.  Compl. ¶¶ 59, 63.  But he insists that the assault did not qualify as domestic violence, as no covered relationship was implicated.  Compl. ¶ 58; Second NICS Packet, ECF No. 11-5, at 2.  Instead, the conviction involved a male complainant with whom Sedita claims he was not in a "qualifying relationship."  Second NICS Packet at 2; 28 U.S.C. § 922(g)(9).  Thus according to Sedita, the misdemeanor conviction should not have disqualified him from obtaining a firearm.

So he applied again to be entered into the Voluntary Appeal File.  Second NICS Packet at 2.  And he demanded that his most recent attempt to buy a firearm be greenlighted.  *Id.*  He attached the charging documents from the state court to demonstrate that his convictions did not implicate domestic violence.  Second NICS Packet at 11–25.  And he insisted that he "has no disqualifiers to the transfer, receipt, possession or ownership of firearms."  Second NICS Packet at 2.  Then he waited.  And waited.  But he heard nothing back.  Compl. ¶ 77.

Six months later, Sedita sent another packet to the CJIS reiterating that he had wrongly been denied a firearm and entry into the Voluntary Appeal File.  Third NICS Packet, ECF No. 11-6, at 2.  He again insisted that "[h]ad an investigation by NICS into the underlying facts been conducted, it would have revealed that . . . the convictions were not 'domestic violence' related."  *Id.*  And he provided the documentation as proof.  Third NICS Packet at 13–27.

The next week, the CJIS purported to "respond[] to [Sedita's] inquiry concerning [his] attempt to possess or receive a firearm."  CJIS Final Response, ECF No. 11-8, at 3.  It again showed that the transaction number for his most recent attempt to buy a firearm could not be located, making it "possible" that the transaction was either "proceeded" or "delayed."  *Id.*  And, in a fit of amnesia, it advised Sedita to apply for a Unique Personal Information Number through

the Voluntary Appeals File program to prevent future extended delays or erroneous denials.  *Id.*

It even attached a blank Voluntary Appeals File application.  CJIS Final Response at 5.

Rather than spin his wheels further, Sedita sued the United States, the Attorney General,

and the Director of the FBI.[1]  He argues that Defendants' conduct violates his rights under 18

U.S.C § 925A and the Second Amendment.  He thus seeks appropriate declaratory and injunctive

relief.[2]  Compl. ¶¶ 86–103.  Defendants moves to dismiss, or, in the alternative, for summary

judgment.  Mot. Dismiss & Summ. J., ECF No. 10.  They argue that sovereign immunity bars the

statutory claim, as the United States has only waived its sovereign immunity for challenges to

*denials* of firearms but Sedita's transactions have only been *delayed*.  Mot. Dismiss & Summ. J.

11–12 (citing 18 U.S.C. § 925A).  And they insist that Sedita's Second Amendment claim falters,

as the Supreme Court has found background checks preceding firearms sales "presumptively

lawful."  Mot. Dismiss & Summ. J. 14–15 (quoting *District of Columbia v. Heller*, 554 U.S. 570,

626–27 & n.26 (2008)).  They contend that Sedita has not rebutted that presumption of

constitutionality.  Mot. Dismiss & Summ. J. 15.

The motions are now ripe for resolution.

## II.

A court must dismiss a case when it lacks subject matter jurisdiction under Federal Rule

of Civil Procedure 12(b)(1).  Whether the United States has waived its sovereign immunity

against suit is "jurisdictional in nature" and is treated as a question of subject matter jurisdiction.

*F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *Wuterich v. Murtha*, 562 F.3d 375, 378 (D.C. Cir.

---

[1] Sedita sued then-Attorney General Merrick B. Garland and then-Director of the FBI Christopher Wray.  Under Federal Rule of Civil Procedure 25(d), when a public officer who is a party in an official capacity stops holding office while the action is pending, the officer's successor is automatically substituted as a party.

[2] Originally, Sedita alluded to a due process claim, Compl. ¶ 35.  But he has since abandoned this theory.  *See generally* Pl.'s Mem. Opp'n, ECF No. 11.  Thus, the Court grants the Defendants' motion to dismiss as it relates to the due process claim as conceded.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).

2009).  The Court must start from the presumption that "a cause lies outside [its] limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  It is up to the plaintiff to disprove that default premise.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"While the Court will accept factual allegations in the complaint as true, those allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Nepal v. U.S. Dep't of State*, 602 F. Supp. 3d 115, 123 (D.D.C. 2022) (cleaned up).  And the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharma., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss for failure to state a claim, a complaint need only contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  And "[i]f on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. Pro. 12(d).

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  A "material fact" is one whose existence affects the outcome.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" exists when the non-movant provides sufficient evidence of a material fact so that a fact finder must resolve the parties' competing versions at trial.  *Id.* at 249.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the

light most favorable to the non-movant, *Anderson*, 477 U.S. at 255 (1986).  Still, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.

### A.

This Court may not skip the starting line.  It must therefore assure itself it has jurisdiction before proceeding.

Start with the assertions against the United States.  "The universally received opinion is, that no suit can be commenced or prosecuted against the United States" without its say-so. *Cohens v. Virginia*, 19 U.S. 264, 411–12 (1821); *see also* Alexander Hamilton, *The Federalist* No. 81, at 487 (Clinton Rossiter, ed., 1961) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.").  Only when the United States chooses to waive its immunity from suit can it be subject to litigation.  *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983).  And "[a] necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied."  *Id.*

Sedita brings a statutory claim against the United States under 18 U.S.C. § 925A.  Compl. ¶ 11.  That provision waives immunity when a plaintiff has been "*denied* a firearm" under the Brady Act.  18 U.S.C. § 925A (citing 18 U.S.C. § 922(s)–(t)) (emphasis added).  So individuals who were not denied a firearm by the federal government may not hale the United States into court.  *Lane v. Pena*, 518 U.S. 187, 192 (1996) ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.").

For the motion to dismiss, Sedita has plausibly alleged that he was denied a firearm by the Government. His Complaint repeatedly makes this claim. Compl. ¶¶ 10, 41, 44, 55. And the Court accepts those allegations as true when considering a motion to dismiss for lack of jurisdiction. *Jerome Stevens Pharms*, 402 F.3d at 1253. True, "where necessary" on a 12(b)(1) motion, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). And there is evidence in the record suggesting that Sedita may have merely been delayed in his purchases rather than denied— the NICS database lacks records of Sedita's purchases, which the Government claims is consistent with delayed purchases but inconsistent with denials. *Compare* 28 C.F.R. §25.9(b)(1)(i) ("NICS denied transaction records . . . will be retained in the Audit Log for 10 years.") *with* 28 C.F.R. § 25.9(b)(1)(ii) (NICS Audit Log records relating to transactions in an open status . . . will be destroyed after not more than 90 days."). In other words, Defendants insist that had Sedita's purchases been denied, there would still be records of those purchases. But there are no such records, they say, so the purchases must have been delayed.

But this is not enough to stymie Sedita from clearing the jurisdictional hurdle. A mere *absence* of records in the NICS database—a system that Sedita is claiming to be riddled with inaccuracies—does not render his allegations of a denial implausible. For purposes of this initial hurdle, the United States has made itself amenable to suit via 18 U.S.C. § 925A.[3]

---

[3] Sedita may only bring this statutory claim against the United States. He is not entitled to bring a Second Amendment claim against the United States because he does not cite a basis for a waiver of sovereign immunity over that claim. *See Lynch v. United States*, 292 U.S. 571, 582 (1934) ("The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. It applies alike to causes of action arising under acts of Congress and to those arising from some violation of rights conferred upon the citizen by the Constitution."); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 704 (1949) (acknowledging that sovereign immunity applies as a default rule in suits for specific relief). While such relief would be potentially available under the APA, Sedita does not purport to proceed under the APA and makes no mention of it in his Complaint or briefing. *See* 5 U.S.C. § 702.

Move now to the Attorney General and Director (together, "Federal Officers"). Sedita seeks injunctive and declaratory relief under the Second Amendment. Well-established principles of equity confirm Sedita's ability to bring a suit against federal officers in their official capacities directly under the Constitution when the officers are allegedly "acting unconstitutionally or pursuant to an unconstitutional grant of power." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–91 (1949); *see also Dugan v. Rank*, 372 U.S. 609, 621–22 (1963). And when a plaintiff is proceeding in equity as such, sovereign immunity is no impediment to specific relief. *Larson*, 337 U.S. at 691; *Dugan*, 372 U.S. at 620–22. This sovereign immunity waiver was later codified in large part in the Administrative Procedure Act. 5 U.S.C. § 702; *see also E.V. v. Robinson*, 906 F.3d 1082, 1090–94 (9th Cir. 2018). The *Larson-Dugan* principle covers Sedita's grievances, and thus he may seek injunctive and declaratory relief against the Federal Officers. *Accord Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("Under [the *Larson-Dugan*] exception, 'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity.").[4]

## B.

With jurisdiction settled, the Court moves to the merits. As both parties present evidence exogenous to the pleadings, the Court treats Defendants' motion as one for summary judgment. *See Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). As to the statutory claim against the United States, Sedita has failed to show that there is a genuine dispute of material fact about

---

[4] 18 U.S.C. § 925A does not impliedly forbid this relief. *See* 5 U.S.C. § 702. The *Larson-Dugan* principle continues to operate despite the APA. *Robinson*, 906 F.3d at 1094. So even if the APA waiver is inapplicable, the Federal Officers are stripped of official immunity under the *Larson-Dugan* equitable tradition.

whether he was denied a firearm by the Government. Thus, the United States is entitled to summary judgment. Still, Sedita has shown that there is a genuine dispute over whether he was subject to an abusive background check regime. So the Federal Officers are not entitled to summary judgment on Sedita's Second Amendment claim.

Start with the statutory claim against the United States. Recall that 18 U.S.C. § 925A provides relief for any individual "denied a firearm" under the Brady Act. Although Sedita plausibly alleged as much when the Court had to take his assertions at face-value, his claim crumbles when evaluated under the more rigorous summary judgment standard. For all three attempted firearm purchases, the record shows that his attempts were delayed but never explicitly denied. When Sedita contacted CJIS to obtain information about his first two purchases, CJIS informed him that the transactions were "too old and the agency no longer had any information related thereto." Compl. ¶ 43. This clashes with denials but is consistent with delays. These attempted purchases were made in 2021. Pl.'s Mem. Opp'n, ECF No. 11, at 3. If these transactions had been formally "Denied" by NICS, the records would still be on file until 2031. 28 C.F.R. §25.9(b)(1)(i) ("NICS denied transaction records . . . will be retained in the Audit Log for 10 years."). But if the transactions were "Delayed," they would have been "destroyed after not more than 90 days from the date of inquiry." 28 C.F.R. § 25.9(b)(1)(ii). The same is true for Sedita's third attempted purchase. Sedita concedes that the CJIS informed him that his purchase "was not 'denied' but delayed.'" Compl. ¶ 46; *see also* First NICS Packet at 10 (indicating the transaction number could not "be matched to a transaction maintained in the NICS" and that "the FBI is required to destroy all proceeded transactions" and "delayed transactions" and thus it was "possible that [Sedita's] transaction fits one of these two categories.").

Defendants' evidence provides the final piece.  By affidavit, a legal administrative specialist in the NICS section testified that information on all three attempted purchases was "purged" at the 90-day mark, "indicating that the transaction[s] [were] not denied."  Decl. David Fazzini, ECF No. 10-2, at 4.  Sedita has mustered no evidence to the contrary, nor does he suggest discovery will produce any.  Thus he has not sufficiently rebutted the Federal Officers' showing that there is no genuine dispute as to the fact of delay.  *See Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1033 (D.C. Cir. 1988).

Perhaps Sedita was ultimately refused a gun by the licensed dealer, and that is why he was unable to complete the transactions.  *See McRorey v. Garland*, 99 F.4th 831, 835 (5th Cir. 2024) (plaintiff arguing that "transferring a firearm without an 'approval' from NICS violates the policies of many federal firearms licensees such as Walmart.").  But the text of the statute is clear:  only individuals "denied a firearm pursuant to [the Brady Act]" are entitled to relief.  18 U.S.C. § 925A.  And the Brady Act only discusses a particular type of denial—one triggered by an explicit communication to the firearms dealer that the transaction would violate state or federal law.  18 U.S.C. § 922(t).  Under the statute, there is no denial at all without such an explicit communication, as dealers may complete the transaction in such a case.  18 U.S.C. § 922(t)(1)(B)(ii) (permitting the sale of a firearm to a "Delay" recipient if three business days have elapsed without an explicit "Denial"); *see also* 28 C.F.R. § 25.6(c)(1)(iv)(B) (same).  Thus, there has not been a "denial" under the statute, and the United States is entitled to summary judgment.  *Accord Ross v. Fed. Bureau of Alcohol, Tobacco, and Firearms*, 807 F. Supp. 2d 362, 374 (D. Md. 2011) ("Thus, for Ross to state a claim . . . under § 925A, he must demonstrate that the NICS improperly provided a 'Denied' response.").

**C.**

Consider now the Second Amendment allegation against the Federal Officers. Sedita insists he "has an individual, preexisting right to possess firearms under the Second Amendment," but that the Federal Officers' conduct violates those rights.[5]  Compl. ¶¶ 87–88. As relevant here, he faults his allegedly false classification in the NICS database as someone prohibited from possessing firearms under the Brady Act. Compl. ¶¶ 1, 2; Pl.'s Mem. Opp'n 2–3. Because the Federal Officers have failed to ensure the accuracy of their database, according to Sedita, they have improperly "plac[ed] the burden" on Sedita "to prove he is not a prohibited person," which, according to Sedita, flouts the Second Amendment. Compl. ¶ 33; Pl.'s Mem. Opp'n 10. More, had they performed their duty to maintain accurate records, they would have discovered "that [Sedita] was no longer subject to an order of protection . . . [and] that [Sedita's] conviction was not a disqualifying event under federal or state law." Compl. ¶¶ 60–62, 65–66.

The Federal Officers do not dispute that there may be inaccurate information about Sedita in the NICS database. But still, they insist that they are not obligated to "correct any and all erroneous information in NICS that could result in an erroneous delay," nor must they "research and obtain background information on the delayed applicant's behalf," or "process a challenge to an allegedly erroneous delayed decision." Mot. Dismiss & Summ. J. 16. In short, then, the Court sees the issue as follows: Does subjecting Sedita to a recurrent delay whenever he tries to buy a firearm, because of a sloppy harboring of erroneous information, infringe his right to keep and bear arms? The Court concludes that it may.

---

[5] In his Complaint, Sedita briefly alleged that he was bringing a facial challenge in addition to his as-applied challenge. Compl. ¶ 95. But as the Government points out, Sedita drops the facial challenge in his opposition briefing. Pl.'s Mem. Opp'n, ECF No. 11, at 11 ("Plaintiff is not challenging the requirement that he undergo a NICS background check when purchasing a firearm from an FFL. Plaintiff is challenging Defendants' continued bar to his right to freely acquire new firearms."); Defs.' Reply, ECF No. 12, at 6 ("Plaintiff clarifies that he is not raising any facial Second Amendment challenge to the Brady Act or its implementing regulations.").

In decreeing that "the right of the people to keep and bear Arms, shall not be infringed," the Second Amendment "codified a *pre-existing* right" built on the core freedoms of "self-preservation" and "self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 592, 595, 599 (2008). That right protects one's ability to possess handguns in the home, *id.* at 636, and one's immunity from discretionary licensing regimes that require a showing of a "special need" to obtain a firearm, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70–71 (2022). The precise contours of the right are still being hashed out by the courts. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 684–86 (2024). But the method for going about a Second Amendment challenge was settled by *Bruen*.[6]

Courts are first to ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* The Court then asks whether "[t]he government [can] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Only if the government can do so "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up). These two phases—the plain text inquiry, then the history-and-tradition inquiry—have been deemed *Bruen* Steps One and Two by the lower courts. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 231–32 (D.C. Cir. 2024). The Court goes in order.

---

[6] The Federal Officers claim that *Bruen* does not apply when a plaintiff is only bringing an as-applied challenge. Defs.' Reply at 6. They do not offer a citation in support of this claim. *See id.* It is unclear how they could. *Bruen* gestured towards its own applicability on Second Amendment as-applied challenges. *Bruen*, 597 U.S. at 38 n.9 (inviting "constitutional challenges" to particularly "abusive" permitting schemes.); *see also id.* at 80 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."). Lower courts have applied *Bruen* to as-applied challenges. *United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024). And the Court is unaware of differing fundamental tests based on the nature of the challenge in other constitutional contexts. *Compare Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988) (applying forum analysis to a facial challenge of a speech regulation) *with Christian Legal Soc. v. Martinez*, 561 U.S. 661, 683 (2010) (applying forum analysis to an as-applied challenge of speech regulation).

**1.**

First, consider whether the plain text of the Second Amendment—which safeguards "keep[ing]" and "bear[ing]" arms—applies to Sedita's proposed course of conduct.  U.S. Const. Amend. II; *Bruen*, 597 U.S. at 32.  Sedita wishes to buy a firearm.  The Court concludes that this is covered by the clear prescription of the Second Amendment.

As defined by Samuel Johnson's 1773 dictionary, to "keep" is "[t]o retain; not to lose," and "[t]o have in custody."  1 *Dictionary of the English Language* 1095 (4th ed.) (reprinted 1978); see 2 N. Webster, *"Keep," American Dictionary of the English Language* (1828) (reprinted 1989) (defining keep as "[t]o hold; to retain in one's power or possession.").  So, "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"  *Heller*, 554 U.S. at 582; *see id.* at 583 (noting that at the Founding, "'Keep arms' was simply a common way of referring to possessing arms.").

As a necessary ancillary to the right of possession, the right of acquisition is protected, too.  If it were not, the letter of the Second Amendment would be stripped of all substance.  *See Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (cleaned up).  One can only keep if one first obtains, and thus the obtainment is protected just as much as the keeping.  Prescriptions of certain acts logically and linguistically entail concomitant prescriptions of their necessary predicates.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) (When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.").  To hold otherwise would be like permitting a bonfire but prohibiting a spark.

When a right is explicitly protected, its essential precursors are implicitly protected—that only makes sense.  *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barret, J., concurring) ("To strip a word from its context is to strip that word of its meaning. . . .  Context [] includes common sense . . . .  Case reporters and case books brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short.").  Thus buying a firearm falls within the plain text of the Second Amendment.  *Accord Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F.4th ---, 2025 WL 340799, at *4 (5th Cir. Jan. 30, 2025); *Gazzola v. Hochul*, 88 F.4th 186, 197 (2d Cir. 2023); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021), *abrogated on other grounds by Bruen*, 597 U.S. at 19; *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).  The consequence of holding that the right to keep and bear arms does not include the right to purchase them is obvious: "step by step . . . limitations on sales could easily displace the right altogether."  *Reese*, 2025 WL 340799, at *5.

To be sure, some courts have suggested the opposite.  The Ninth Circuit in *B&L Productions, Inc. v. Newsom*, for instance, found that the plain text of the Second Amendment did not cover the sale and purchase of firearms and ammunition on state property.  104 F.4th 108, 117 n.17 (9th Cir. 2024).  In doing so, the court stressed that "[t]he plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms."  *Id.* at 117.  And it noted that "[o]n its face, that language says nothing about commerce, let alone firearm sales on state property."  *Id.* at 117–18.  So the court thought a burden on purchase did not, by itself, satisfy *Bruen* Step One.

Still, the panel acknowledged that "unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless."  *Id.* at 118.  To account for this recognition, the court imposed a wrinkle on *Bruen* Step One, finding

that "the plain text of the Second Amendment only prohibits *meaningful constraints* on the right to acquire firearms." *Id.* (emphases added).  But it concluded that the plaintiff failed to make such a showing, so it found that no constitutional rights had been violated.  *Id.* at 120.

The Fifth Circuit held similarly when evaluating plaintiffs' challenges to the NICS background check system.[7]  *McRorey*, 99 F.4th at 836 (listing plaintiffs' challenges to the NICS system).  It emphasized that the plain text of the Second Amendment only covered plaintiffs' right "to keep and bear arms," and that "on its face, 'keep and bear' does not include purchase— let alone without [a] background check."  *Id.* at 838.  But it noted that "[t]he right to 'keep and bear' can implicate the right to purchase," which is why *Bruen* "prohibits shoehorning restrictions on purchase into functional prohibitions on keeping."  *Id.*

For this latter point, the Fifth Circuit pointed to footnote nine in *Bruen*.  This footnote remarks that background checks are generally constitutional, but it stresses that such regimes can still be "put toward abusive ends" and thus constitutional challenges are not to be "rule[d] out." *Bruen*, 597 U.S. at 38 n.9.  The Fifth Circuit presumably saw this as a gloss on the Step One inquiry—that is, if an impediment to acquisition is abusive enough, it effectively becomes a restriction on keeping, and thus the plain text of the Second Amendment is implicated. Otherwise, the plain text is unbothered by the regulation.  So the Fifth Circuit asked whether plaintiffs showed that the NICS-related regulations had "been 'put toward abusive ends'" and concluded they did not.  *Id.* at 839 (quoting *Bruen*, 597 U.S. at 38 n.9).  The court thus dismissed their claims at Step One.  *Id.* at 840.

---

[7] The Fifth Circuit's recent opinion in *Reese* calls *McRorey*'s analysis into doubt.  *See Reese*, 2025 WL 340799, at *4.  As both opinions are panel opinions, there seems to be some discordance within the Fifth Circuit over how to approach challenges to purchase restrictions.  *Id.* (acknowledging that *McRorey* "stated that the 'keep and bear' language does not include 'purchase'" but nonetheless holding the opposite).  This Court finds *Reese* to be more persuasive.

This Court respectfully disagrees with the approach taken by these courts. Recall that the text of the Second Amendment cannot be read in a vacuum. *United States v. Kirby*, 74 U.S. 482, 487 (1868) ("The common sense of man" understands that a statute reading "'whoever drew blood in the streets should be punished with the utmost severity,' [does] not extend to the surgeon who opened the vein of a person that fell down in the street in a fit."). And common-sense dictates that logically necessary predicates of rights are protected to the same extent as the rights themselves. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise."). Thus a careful reading of the Second Amendment supports a finding that the right to acquire arms is protected. So no freewheeling inquiry into the degree of intrusion is necessary at *Bruen* Step One.

Indeed, the Ninth and Fifth Circuit's supposed commitment to the text falls flat. The Ninth Circuit pays lip-service to textualism when it insists on a highly literal understanding of "keep and bear arms" stripped of pertinent context. *B & L Prods., Inc.*, 104 F.4th at 117. But then it adds an extra-textual flair by permitting plaintiffs to satisfy *Bruen* Step One if they can show that "a regulation 'meaningfully constrain[s]' the right to keep and bear arms for the purpose of self-defense." *Id.* at 119. Of course, "meaningful impairment" does not appear in the Second Amendment. And that Amendment does not only kick in when the right to self-preservation has been infringed to a threshold degree (which presumably lies in the discretion of judges). It protects "keep[ing] and bear[ing]," full stop. U.S. Const. Amend. II. Indeed, the Ninth Circuit's novel approach looks suspiciously like the pre-*Bruen* interest-balancing analysis that has since been condemned. *Bruen*, 597 U.S. at 19 ("[Our precedents] do not support applying means-end scrutiny in the Second Amendment context.").

Meanwhile, the *McRorey*'s attempt to wedge *Bruen* footnote nine into Step One is awkward. *Bruen* Step One is an individual-centric inquiry. It focuses on *the complainant's* proposed course of conduct and determines whether that desired behavior falls within his *individual*, preexisting right to keep and bear arms for self-defense. *Maryland Shall Issue v. Moore*, 116 F.4th 211, 237 (4th Cir. 2024) (en banc) (Niemeyer, J., concurring in part) ("Explaining the test, the *Bruen* Court noted that at the first step, a court must focus on the plaintiff's conduct and determine whether it is covered by the text of the Amendment."); *Reese*, 2025 WL 340799 ("The threshold textual question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment 'covers' the conduct . . . to begin with."). In contrast, Step Two of the *Bruen* framework is a government-focused analysis. It asks whether the *regulation* at issue falls within this nation's history and tradition of gun regulation. *See Bruen*, 597 U.S. at 38 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement.").

Footnote nine is policy oriented. It comments that most states' nondiscretionary licensing regimes that require background checks are likely constitutional. *Id.* at 38 n.9. But it suggests that even seemingly mundane licensing regimes can be constitutionally suspect if pernicious in practice, such as by imposing "lengthy wait times in processing license applications or exorbitant fees." *Id.* So whether a regulation has been "put toward abusive ends" does not fit comfortably within an inquiry of whether an *individual* seeks to engage in conduct protected under the Second Amendment. *Id.* Instead, it belongs under the broader question of whether that challenged policy is "consistent with this Nation's historical tradition" of "narrow, objective, and definite" licensing regimes—or whether it departs from that tradition. *Id.* at 17 & n.9; *see*

*also Maryland Shall Issue*, 116 F.4th at 232 (Rushing, J., concurring in the judgment) ("Footnote Nine gives lower courts insight into the degree of fit necessary for a shall-issue licensing regime to be relevantly similar to historical analogues and thus consistent with the Nation's historical tradition of firearm regulation.").

Thus when an individual seeks to buy a firearm, "the Second Amendment's plain text covers [his] conduct," and "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.  The Federal Officers argue otherwise, insisting that no constitutional right is implicated here because Sedita was never denied a firearm by the Government.  Instead, his purchases were merely delayed, and at most for three days.  Mot. Dismiss & Summ. J. 15–16.  And though Sedita may have ultimately been denied a firearm by the *dealer*, the Federal Officers insist that is not a matter of constitutional concern, as "a third party's legitimate discretion breaks the chain of constitutional causation." *Id.* (quoting *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021)).

The Court is unconvinced.  *But cf. Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024) (holding that the *Bruen* "proposed course of conduct" is "what the challenged law *prevent[s]*" plaintiffs from doing).  For starters, there is more than mere delay happening here—Sedita appears to face a system that retains inaccurate information about his criminal history, which subjects him to an unavoidable hurdle each time he tries to buy a gun with no effective appeals process to remove that hurdle.  But more importantly, those considerations do not belong at Step One of the *Bruen* framework.  Again, *Bruen* Step One does not focus on the degree of burden placed on an individual's desired course of conduct and use that metric to determine whether the plain text of the Second Amendment has been implicated.  That is working backwards.

*Bruen* Step One only asks whether the complainant wants to do something covered by the Amendment's text.  Whether the government can legitimately impede that proposed course of conduct—and the degree to which it may do so—comes in at the next phase of the inquiry.  This is standard fare when interpreting constitutional rights.  In other constitutional contexts, courts do not ask whether a regulation has fully prohibited an individual from exercising her right before acknowledging the right comes into play at all.  Instead, courts recognize that "even temporary deprivations" of constitutional rights can penalize those rights.  *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 907 (1986); *see also First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304 (1987); *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).  Only after acknowledging that a right has been violated do courts turn to investigating the severity of the deprivation.

In short, the Court concludes the following:  Regulations impeding the acquisition of a firearm—including background checks—implicate the plain text of the Second Amendment.  The ultimate question of whether such a regulation is an "infringe[ment]" on a person's right to keep and bear arms, perhaps because it was "put toward abusive ends," is a matter dealt with at Step Two of the *Bruen* framework.  U.S. Const. Amend. II; *Bruen* 597 U.S. at 38 n.9; *see also Maryland Shall Issue*, 116 F.4th at 238 (Niemeyer, J, concurring in part).  It is to that question the Court now turns.

## 2.

At Step Two, the Federal Officers bear the burden of "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  *Bruen* footnote nine acknowledges that "definite" and "objective" background checks fall comfortably within that tradition.  597 U.S. at 38 n.9; *see also Antonyuk v. James*, 120 F.4th 941,

983–84 (2d Cir. 2024) ("The Court's statements reflect a recognition that such regulations are not inherently inconsistent with the Second Amendment or our historical tradition.").  But when a particular licensing regime diverges from that tradition—perhaps by becoming "abusive"—it infringes on the Second Amendment.

"Following *Bruen*, the Supreme Court has not explained what constitutes 'abusive ends' in the context of firearm regulations, aside from its discussion of 'shall issue' licensing regimes." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 124 (10th Cir. 2024).  And only a couple lower courts have explicated the phrase.  *See id.* (asking whether a challenged age limit was "arbitrary or improper, in order to determine whether the statute serves legitimate purposes or is being put to abusive ends"); *Rhode v. Bonta*, 713 F. Supp. 3d 865, 876 (S.D. Cal. 2024) (finding a "cumbersome and byzantine background check system" abusive "where record data mismatches, lengthy and occasionally infinite wait times, and sometimes exorbitant fees" were common).  In the context of Sedita's challenge, the Court finds a seemingly permissible background check regime could become abusive if riddled with inaccuracies but bereft of an effective method to correct those inaccuracies, leading to perpetual and inevitable delays on firearm purchases.  At the very least, the Federal Officers present no evidence of this nation's historical tradition suggesting otherwise.

More record development is necessary before the Court can conclude whether Sedita experienced an abusive background check system at the Federal Officers' hands.  Sedita has shown that there is a genuine issue of material fact as to whether CJIS continued to harbor erroneous information about him, despite his corroborated protestations to the contrary.  *See* Pl.'s Mem. Opp'n 5 ("Defendants' April 17, 2023 letter improperly shifted the burden to Plaintiff to 'correct' the information maintained by Queens County court—a fallacy because nothing in the

Queens County database indicates that Plaintiff falls under 18 U.S.C. § 922(g)(8)."); Second NICS Packet at 11–25 (records from Queens County). And he has established that there is a legitimate question about whether his attempts to utilize the Voluntary Appeals File were fruitless because of inherent procedural flaws with the system. *See* CJIS Final Response at 3 (urging Sedita to apply for the Voluntary Appeals File while failing to acknowledge he had already done so). This suggests delays will persist in the future, through no fault of his own and with no ability for him to correct it. More, it has raised the specter of a system that promises appeals and vindication, but in practice is intended to frustrate or dissuade individuals from exercising their Second Amendment rights. Kafkaesque indeed.

## IV.

In sum, the Court has jurisdiction to hear this suit, and it treats the present motion as one for summary judgment. The Motion to Dismiss is thus only **GRANTED IN PART**, as far as it relates to Sedita's now-abandoned Due Process claim. The United States has met its burden to show that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law on Sedita's statutory claim. So the Motion for Summary Judgment by the United States is **GRANTED**. But there is a genuine dispute of material fact on Sedita's Second Amendment claim. So the Motion for Summary Judgment by the Federal Officers is **DENIED.**

**SO ORDERED**.

Dated: February 4, 2025

_____
TREVOR N. McFADDEN, U.S.D.J.